**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SUZANNE SULLIVAN,<br><br>  Plaintiff,<br><br>v.<br><br>EXACT SCIENCES CORPORATION, et al.,<br><br>  Defendants. | )<br>)<br>)<br>)<br>)  2:22-cv-00116<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>OPINION</u>

**Mark R. Hornak, United States District Judge**

During one of the deadliest pandemics in history, medical professionals moved quickly to produce a vaccine against the novel coronavirus, commonly known as COVID-19. With innovative mRNA technology, scientists believed they could create a vaccine using only the virus's genetic sequence, instead of using a weakened form of the physical virus. This plan would bypass the slow and complex process of growing live viruses in labs, thus putting a COVID-19 vaccine out for public administration much faster than usual. It worked. COVID-19 vaccines were developed at an unprecedented pace, becoming widely available less than a full year after the virus's genetic sequencing.

While tens of millions received the mRNA vaccine without concern, this record-breaking time of development gave some others pause. For these individuals, the speed at which the COVID-19 vaccines were created raised concerns of safety and efficacy. These concerns were only heightened in an environment where COVID-19 and the public and medical response to it had become a widespread political issue. For some, it was not off base during this time to be cautious about receiving a medical injection that was made quickly using an innovative vaccination technology, especially when even the most discerning listener did not have to look far to find

1

various commentators, scientific or otherwise, questioning its legitimacy. For others, the vaccine's arrival generated confidence in their ability to safely return to daily activities unimpeded by more complicated COVID-19 precautions and concerns.

But there was still a pandemic going on, and for many, remaining unvaccinated was seen as posing risks for themselves and those around them. For many employers whose employees could work remotely — performing most if not all of their job's functions safely and essentially alone at home — this was not an issue. For others, working face-to-face was central to the job. Some employers in this latter category saw that requiring vaccination for their employees could greatly reduce the risk of COVID-19 transmission on the job while allowing the course of business activities to resume and proceed. These employers began to require vaccination for any position involving face-to-face interaction. This at times caused friction when such requirements rubbed up against the vaccine skepticism some employees harbored. And this friction had the capacity to fuel workplace passions, leading to disputes, confrontations, and even employment terminations when the employer's directives collided with the views and concerns of involved employees.

That narrative in some ways lays down the background for this case. But to be clear, to decide the matters now front and center in this case in the Defendants' Motion for Summary Judgment, the Court need not resolve those broader competing public and personal interests, nor is it charged with assessing the wisdom of the workplace vaccination policies involved here or the perception of employees about them.  The issues presently before the Court are more constrained and instead require the Court to consider whether the decisions in play here could be found by a rational jury to violate federal and state statutes addressing disability discrimination in the workplace and providing for workplace leave.

Suzanne Sullivan ("Plaintiff" or "Ms. Sullivan") worked as a Professional Medical Representative for Exact Sciences Corporation ("Exact"), selling cancer screening technology to health care providers. Because these sales occurred face-to-face, there came a time when Exact required all employees in Ms. Sullivan's position to receive the COVID-19 vaccine to remain in their job. Ms. Sullivan was skeptical of the safety and efficacy of the COVID-19 vaccine, and she and at least one other co-worker had expressed this skepticism to Exact's upper management. Central to the issues in resolving the pending Motion, she also had previously experienced complications with influenza vaccine injections, and she requested a temporary exception from her employer's vaccine requirement to undergo medical testing to ensure the COVID-19 vaccine would be safe for her. Her request was eventually denied after some time and several general extensions to Exact's vaccination timetable, and she choose employment termination over receiving the COVID-19 vaccine or applying to fill another role within her employer.

Now Ms. Sullivan brings this lawsuit against Exact (her employer), and its Chief Executive Officer Kevin Conroy. In her Amended Complaint, Ms. Sullivan alleges disability discrimination, unlawful retaliation, and violations of her rights under the Americans with Disabilities Act ("ADA"), the Pennsylvania Human Relations Act ("PHRA"), and the federal Family Medical Leave Act ("FMLA"). (ECF No. 22). Defendants have filed a Motion for Summary Judgment. (ECF No. 72). The Motion has been fully briefed, (ECF Nos. 81, 86), the Court has heard Oral Argument on the parties' positions, (ECF No. 99), and the parties have had the chance to file Supplemental Memoranda as directed by the Court relative to issues the Court identified as being tied into the arguments of the parties, (ECF Nos. 102, 103, 107, 108). For the reasons that follow, Defendants' Motion for Summary Judgement will be GRANTED IN PART and DENIED IN PART.

**BACKGROUND**

Ms. Sullivan began working for Exact in late 2019, a few months before the spread of COVID-19 was declared a pandemic, as a Professional Medical Representative ("PMR"), promoting the benefits of using Exact's cancer screening technology to health care providers. (ECF No. 80 ¶¶ 7, 8). Ms. Sullivan made her sales pitches face-to-face with providers in their facilities, sometimes even in their offices. (ECF No. 80 ¶ 11). Ms. Sullivan typically saw between six and ten providers a day, and had a company-assigned goal to visit around 40 providers per week. (ECF No. 80 ¶¶ 9, 10).

Then, the pandemic. As COVID-19 spread rapidly across the country in early 2020 Exact pulled its PMRs from the field. After public understanding of COVID-19's transmission mechanism improved, Exact redeployed its PMRs in late June 2020 with certain safety policies in place. (ECF No. 80 ¶ 15). These policies mandated masking, testing, and social distancing. PMRs were required to always maintain a safe distance from others while working and to wear a face mask when interacting with providers. (ECF No. 75-1 at 90:23-91:5). PMRs were also required to take a COVID-19 test every fourteen days. (ECF No. 82-19 at 5).

Exact announced its COVID-19 vaccination policy on July 30, 2021. (ECF No. 80 ¶ 16). COVID-19 vaccines were by then widely available, and CEO Kevin Conroy announced that any Exact employee whose job included in-person work would need to be fully vaccinated by September 15, 2021. (ECF No. 80 ¶ 16). This deadline was later extended to October 1, 2021. (ECF No. 80 ¶ 17). Mr. Conroy also announced a process for employees to request accommodations and exemptions from this policy for qualifying medical and religious reasons. Employees making such requests were often offered an accommodation in the form of the opportunity to apply for an alternative role in the company and were given preference for

4

placement in such roles during the application process. (ECF No. 80 ¶¶ 22, 24). Notably, this was not a guarantee of placement in another role.

Ms. Sullivan did not want to receive the COVID-19 vaccine. She was concerned that the vaccines were unsafe and that they had not undergone adequate testing during their development and subsequent rollout. Her concern at least partially stemmed from personal experiences she had when receiving the influenza vaccine (commonly referred to as the flu shot) in 2005, 2016, and in 2021. (ECF No. 80 ¶ 62). Ms. Sullivan reported an adverse reaction after each flu shot, with her reaction in 2021 being the most severe.

Ms. Sullivan elected to take the influenza vaccine in August 2021 as a trial run for her possibly receiving the COVID-19 vaccine. After receiving that flu shot, she reported experiencing "shortness of breath, rash, hives, itchiness in the back of the neck and throat, throat tightening, feeling out of sorts, malaise, and the swelling of the tongue and lips." (ECF No. 80 ¶ 161). These symptoms developed soon after the vaccine was administered, prompting her to immediately seek the medical advice of Dr. Robert J. Schmidt. Dr. Schmidt was not Ms. Sullivan's regular personal physician, but she chose to consult with him after first attempting to contact her regular doctor and learning they were unavailable. (ECF No. 80 ¶ 163).

Ms. Sullivan spoke with Dr. Schmidt over the phone on August 11, 2021, about thirty minutes after she received the flu shot. (ECF No. 80 ¶ 63). Dr. Schmidt told Ms. Sullivan that based on her reported symptoms he believed she was suffering from hypoxia, a condition where low levels of oxygen in the blood causes symptoms of malaise and shortness of breath. (ECF No. 82-15 at 43:20-45:16). Dr. Schmidt informed Ms. Sullivan that hypoxia can be caused by anaphylaxis and advised her to go to the emergency room. (ECF No. 82-15 at 68:22-24). However, out of what she says was her concern about exposure to COVID-19 within the emergency room,

5

she refused to go. (ECF No. 82-1 at 111:11-14). Dr. Schmidt prescribed prednisone and an EpiPen, and instructed Ms. Sullivan to take Benadryl. (ECF No. 82-1 at 112:10-20). The next day Ms. Sullivan's symptoms had largely abated. (ECF No. 82-1 at 114:12-17).

Ms. Sullivan had a follow up appointment in person with Dr. Schmidt on August 12, 2021. (ECF No. 80 ¶ 66). Dr. Schmidt concluded that the symptoms Ms. Sullivan experienced after receiving the influenza vaccine were consistent with early anaphylaxis. Dr. Schmidt was concerned that Ms. Sullivan may be allergic to the flu shot and that the COVID-19 vaccine could cause a similar reaction. He told her she should not take the COVID-19 vaccine until she had undergone additional testing to determine it was safe for her to do so. (ECF No. 82-15 at 50:8-12).

Dr. Schmidt was concerned that the adverse reaction from the influenza vaccine was caused by some of the vaccine components also present in the COVID-19 shot. Specifically, he believed the reaction may have been caused by an allergy to "the excipients, which is a non-antibody stimulating part of vaccines that were in the flu vaccine." (ECF No. 82-15 at 50:24-51:1). These excipients are "in both the flu vaccine and the Johnson and Johnson vaccine . . . [and] cross-reacts with an excipient in both the Pfizer and Moderna COVID-19 vaccines." (ECF No. 82-37 at 1). Dr. Schmidt recommended Ms. Sullivan contact Dr. Andrej Petrov, an allergy specialist, who could perform a skin test to see if Ms. Sullivan was allergic to these excipients.

Despite seeing Dr. Schmidt on August 12, 2021, Ms. Sullivan was not scheduled for a skin test with Dr. Petrov until December 6, 2021. (ECF No. 80 ¶ 80). Thus, the results of this skin test would not be available until well after the October 1st deadline that Exact had set for employees to become fully vaccinated. The record does not detail why this time period was so long, given the speedier timelines of other events germane to this matter, but Ms. Sullivan stated that when she attempted to get an earlier appointment with Dr. Petrov by explaining that she needed the results

to comply with an impending work deadline, she was unsuccessful. (ECF No. 82-12 at 65:14–66:13). The record also shows that she did not try to contact any other doctor with the same specialty as Dr. Petrov to try and schedule an earlier skin test appointment, opting to stick "with the doctor that Dr. Schmidt had familiarity with and recommended." (ECF No. 75-2 at 93:14-17). Ms. Sullivan did keep her original December appointment with Dr. Petrov, who after an initial evaluation, recommended she come back the next month to undergo a skin test. (ECF No. 80 ¶ 95). But because Ms. Sullivan contracted COVID-19 three days prior to that scheduled skin test date, she would not receive a skin test from Dr. Petrov until years later at this Court's direction and as part of this litigation. (ECF No. 65).

Ms. Sullivan requested an accommodation from Exact extending the October 1, 2021 vaccination deadline until after she received the results of the skin test from Dr. Petrov, results that at the time she believed she would receive in December of that year. Ms. Sullivan was told that Exact would consider extensions of the deadline to comply with the vaccination requirement for employees who are actively engaged in the accommodation process. (ECF No. 80 ¶ 49). On August 6, 2021, she received an accommodation request form and was told to have her healthcare provider answer the form's questions. (ECF No. 80 ¶ 74). Dr. Schmidt provided his answers, and Ms. Sullivan submitted a completed form on August 18, 2021. (ECF No. 80 ¶ 76).

On the completed accommodation request form, Dr. Schmidt informed Exact that it was his medical opinion that Ms. Sullivan should not receive the COVID-19 vaccine until she had undergone further testing to assess whether the issues with the flu vaccine that Ms. Sullivan experienced would carry over to the COVID-19 vaccine. Dr. Schmidt wrote that Ms. Sullivan "has a significant possibility of experiencing a [] life-threatening reaction to the" COVID-19 vaccine. (ECF No. 82-37 at 1). This was due to her "very uncommon medical problem" which Dr. Schmidt

wrote required "a medical exemption and accommodations made" for her continued health and safety. (ECF No. 82-37 at 3).

While Ms. Sullivan's request for accommodation was pending, she and several of her likeminded colleagues attempted to persuade higher ups at Exact to change the company's vaccination policy. They shared news articles describing the drawbacks of using the COVID-19 vaccine. One colleague, Dillan Roth,[1] sent an email which led to a hotly charged phone call that he had with Defendant Kevin Conroy on the morning of August 31, 2021. (ECF No. 85 ¶ 247).

That day, Mr. Roth and Mr. Conroy spoke by phone about the necessity of Exact's vaccination policy. Although it started off cordial, that conversation soon turned sour. Mr. Conroy told Mr. Roth he was appalled at the tone and composition of the email Mr. Roth had sent to him. Mr. Roth apologized for the composition but refused to apologize for the tone. Mr. Conroy was surprised, and asked Mr. Roth if he took the same approach in his interactions with doctors while in the field. Mr. Roth replied affirmatively and stated, "we're told to be aggressive." (ECF No. 82-2 at 50:17-18). Mr. Conroy said Mr. Roth had "audacity" and told him that "maybe some other employer will appreciate that." (ECF No. 82-3 at 68:21-69:2). Mr. Roth asked Mr. Conroy if he would reconsider Exact's vaccination policy. Mr. Conroy said he would not, and before he hung up, he told Mr. Roth: "I know you're going to tell . . . your [][2] friends about this, so tell them this. If they want to make a decision that I think is a selfish one, then they will need to find another employer to work for." (ECF No. 82-3 at 57:8-57:16).

The accommodation request Ms. Sullivan submitted on August 18, 2021 was denied on September 27, 2021. (ECF No. 80 ¶¶ 76, 78). She was informed that she had three options: (1)

---

[1] Mr. Roth is not a named party to the present lawsuit.

[2] Mr. Roth claims Defendant Conroy said "little friends." Mr. Conroy disputes this. (ECF No. 82-3 at 57:15-16).

become fully COVID-19 vaccinated; (2) apply for an alternate role within Exact for which she was qualified; or (3) resign with severance. Ms. Sullivan was also told she had the option to delay full vaccination until November 25, 2021 if she committed to being fully vaccinated by that date. (ECF No. 82-17). Ms. Sullivan declined the proposed extension. She instead informed Exact of her intention to resign with severance. She was sent over a severance agreement, but ultimately decided not to sign it. Her employment was terminated on October 4, 2021. (ECF No. 80 ¶ 93).

The parties disagree about who was in charge of denying Ms. Sullivan's accommodation request. Ms. Sullivan alleges that Defendant Conroy directly made the decision to deny her accommodation request. Sarah Condella, a member of Exact's Human Resources team, testified that Defendant Conroy was "the primary decisionmaker" responsible for deciding if employees were granted exceptions to the vaccine requirement or not. (ECF No. 80-4 at 41:4-13). Defendants dispute this and argue that while Mr. Conroy was responsible for policy-level decisions about vaccine accommodations generally, he was not involved in any individual request, including Ms. Sullivan's. According to Defendants, Mr. Conroy was not even aware Ms. Sullivan had made an accommodation request, or that it was denied. (ECF No. 75-1 at 123:14-18).

Exact had granted some extension requests made by other employees on terms specifically related to those requests. In total, fifteen PMRs, including Ms. Sullivan, requested a medical exemption from the COVID-19 vaccination requirement. (ECF No. 87-3 at 5). Ten of these PMRs later withdrew their requests. (ECF No. 87-3 at 5). Three, including Ms. Sullivan, were terminated from employment. (ECF No. 87-3 at 5). Two others were allowed temporary extensions for medical reasons. (ECF No. 87-3 at 5). The first of these was a PMR who had tested positive for COVID-19 shortly before the vaccination deadline, constraining the time window in which they could safely receive the next vaccine. (ECF No. 87-3 at 6). The second was a PMR who had a

scheduled medical procedure in early October 2021 and for whom the vaccination would cause complications. (ECF No. 87-3 at 6). Both employees were required to receive the COVID-19 vaccination as soon as they were medically cleared to do so to remain in their PMR roles. (ECF No. 87-3 at 6).

Ms. Sullivan filed this lawsuit on July 13, 2022, (ECF No. 1), and then filed an Amended Complaint on February 21, 2023, (ECF No. 22). Defendants subsequently filed a Motion to Compel Plaintiff's Independent Medical Examination. (ECF No. 46). The Honorable Judge Kim R. Gibson, who presided over this case until it was reassigned to this member of the Court, granted that Motion. (ECF No. 65). Judge Gibson ordered Dr. Petrov administer a skin test to Ms. Sullivan, specifically testing for allergies to "[c]omponents of the flu vaccines that were available in 2021; and [c]omponents of the COVID-19 vaccines that were available in 2021." (ECF No. 68 ¶ 3).

Dr. Petrov administered that skin test on August 4, 2023. Unfortunately, the 2021 influenza vaccine could not be tested as it had been superseded by later versions, so Plaintiff was instead tested for the influenza vaccine available in 2023. (ECF No 82-39 at 3). As for the COVID-19 vaccine components, Plaintiff was tested for an adverse reaction from "polysorbate 80" and "polyethylene glycol" — the two excipients Dr. Schmidt had been worried about. (ECF No. 82-39 at 3). There is no evidence in the record that these two excipients differed or otherwise had materially changed from those used in the 2021 versions of the COVID-19 vaccine. Based on the results of the skin test, Dr. Petrov concluded that Ms. Sullivan had a "possible . . . hypersensitivity" to the flu vaccine and recommended that if she take it again, she do it through a split dose.[3] (ECF No 82-40). However, Dr. Petrov made it clear that Ms. Sullivan could safely "proceed with COVID vaccination." (ECF No. 82-40).

---

[3] A split dose is a vaccine administration strategy where the dosage is not administered through a single shot. Instead, the dose is "split" between two shots that are administered separately.

Defendants filed this Motion for Summary Judgment. Ms. Sullivan filed her Response, and Defendants filed their Reply. The Court heard Oral Argument on the matter. The Court also requested Supplemental Memoranda from the parties to address issues that the Court concluded were involved in the disposition of the Motion and which had not been fully briefed previously. All relevant documents have been filed and the Defendants' Motion is ripe for review.

## **DISCUSSION**

Ms. Sullivan brings five counts. Count I, brought against Exact only, alleges disability discrimination in violation of the ADA and the PHRA. Court II, brought against all Defendants, alleges unlawful retaliation, again in violation of the ADA and PHRA. Count III, brought against Exact only, alleges a violation of Ms. Sullivan's rights under the FMLA. Count IV, also brought against Exact alone, alleges unlawful retaliation and discrimination in violation of the FMLA. Finally, Count V is exclusively brought against Mr. Conroy and accuses him of aiding and abetting the alleged unlawful discrimination in violation of the PHRA. Defendants argue they are entitled to summary judgment on all five Counts.

### I.     Standard of Review.

Under Federal Rule of Civil Procedure 56, the Court must enter summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material "only if it might affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006). To prevent summary judgment, the non-movant must present evidence that creates a genuine dispute of material fact with respect to every essential element of the cause of action. *See Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013).

11

In deciding whether to grant summary judgment, the Court does not weigh the evidence or make credibility determinations. *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). Rather, the Court must view the evidence in the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The resulting report of a medical examination conducted pursuant to Federal Rule of Civil Procedure 35 is evidence the Court is permitted to evaluate at the summary judgment stage, as it is evidence in the record. Fed. R. Civ. P. 56(c)(3). If there is a conflict between the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). While the Court is charged with determining whether there are any genuine issues of fact, and if there are, whether they are material, the Court does not make credibility assessments in resolving such a motion.

## II. There Are Sufficient Questions Of Fact To Allow Plaintiff's ADA and PHRA Disability Discrimination Claims To Go To Trial.

The ADA and the PHRA are both workplace anti-discrimination statutes. While the PHRA is a state law passed by the Pennsylvania legislature, it is "to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently." *Fasold v. Justice*, 409 F.3d 178, 184 n.8 (3d Cir. 2005). In cases involving a claim under both the ADA and PHRA, "our analysis of an ADA claim applies equally to a PHRA claim." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)). Thus, the Court will analyze both Plaintiff's ADA and PHRA claim simultaneously.

The ADA prohibits discrimination "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). A qualified individual is any employee who "with or without reasonable accommodation, can perform the essential functions of the employment position that

such individual holds or desires." 42 U.S.C. § 12111(8). An employer can be found to have unlawfully discriminated against an employee by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). An employee who experienced this kind of unlawful discrimination may bring a failure-to-accommodate claim against their employer.[4]

A plaintiff bringing a failure-to-accommodate claim must establish: "(1) he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been reasonably accommodated." *Capps v. Mondelez Global, LLC*, 847 F.3d 144, 157 (3d Cir. 2017) (quoting *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006)). Making a good faith effort to assist requires an employer to engage in an "interactive process" to identify an appropriate accommodation. *Taylor*, 184 F.3d at 312. And a proposed accommodation is by definition unreasonable if it places an "undue hardship" on the employer. *Buskirk v. Apollo Metals*, 307 F.3d 160, 168 (3d Cir. 2002).

a.  *Ms. Sullivan's Status As A Qualified Individual.*

As a threshold matter, Ms. Sullivan cannot bring any disability discrimination claim if she is not a qualified individual. A qualified individual is defined by their ability to perform the essential functions of the job with or without an accommodation. "Whether a job duty is an 'essential function' turns on whether it is 'fundamental' to the employment position." *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 612 (3d Cir. 2006) (quoting 29 C.F.R. § 1630.2(n)(1)). An

---

[4] Generally, disability discrimination claims under the ADA are analyzed under the familiar burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Fowler v. AT&T, Inc.*, 19 F.4th 292, 298 (3d Cir. 2021). The Third Circuit has not directly addressed the issue of whether this framework applies to failure to accommodate claims, although it has affirmed a district court decision concluding that failure to accommodate claims under the ADA should not be evaluated under this framework. *See Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661 (3d Cir. 1999).

employer's judgment as to which functions are essential is generally strong evidence of this fact, *see* 29 C.F.R. § 1630.2(n)(3), but "the employer's judgment as to which functions are essential – is but one piece of evidence to be considered." *Turner*, 440 F.3d at 613 n.6. This is one piece out of many. *See* 29 C.F.R. § 1630.2(n)(3)(listing factors to consider when determining if a job function is essential).

Because determining whether a job function is essential demands a fact-specific analysis, that decision is often a job better suited to the jury, rather than the Court. *See Turner*, 440 F.3d at 613; *Keith v. Cnty. of Oakland*, 703 F.3d 918, 926 (6th Cir. 2013). That is the path the Court will follow here. Defendants argue that taking the COVID-19 vaccine was an essential function of Ms. Sullivan's job at Exact because the vaccine's protections were necessary for Ms. Sullivan continued face-to-face sales as a PMR. And of course, Exact's policy made taking the vaccine a requirement as it defined the job for continued service at that time as a PMR. Plaintiff disagrees and points out that she and many other PMRs safely performed their PMR roles prior to the vaccine's existence by following standard masking, distancing, and testing policies. Because a jury, and not the Court, is charged with resolving disputed facts, including whether taking the COVID-19 vaccine at the time it was required by Exact was fundamental to Ms. Sullivan's PMR role, summary judgment will not be granted on the grounds that Ms. Sullivan was not a "qualified individual." That result does not resolve the Motion, however, so on to the next steps.

   b.  *Ms. Sullivan's Status As An Individual With A Disability.*

To succeed on her failure-to-accommodate claim, Ms. Sullivan must first demonstrate that she was disabled and her employer knew it. A plaintiff is disabled under the ADA and PHRA if she: (1) has "a physical or mental impairment that substantially limits one or more" of her "major life activities;" (2) has "a record of such an impairment;" or (3) is "regarded as having such an

14

impairment." *Morgan v. Allison Crane & Rigging LLC*, 114 F.4th 214, 221 (3d Cir. 2024)(quoting 42 U.S.C. § 12102(1)). Major life activities include "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, []working" or any other activity comparably important to human life. *Fiscus v. Wal-Mart Stores, Inc.*, 385 F.3d 378, 382-84 (3d Cir. 2004).

Ms. Sullivan argues she is disabled under both the "actual disability" definition and the "record of" definition. Based on the current case record, the Court is convinced that a genuine issue of material fact exists as to both Ms. Sullivan actually having an impairment substantially limiting one or more of her major life activities at the time her accommodation request was denied, and as to there being a record of such an impairment at that time. Thus, summary judgment will not be granted on the basis of Plaintiff not meeting the statutory definition of "disabled."

Ms. Sullivan first claims she was actually disabled at the time her employment ended. A plaintiff alleging they are disabled because they actually have an impairment substantially limiting a major life activity must demonstrate the impairment existed at the time they requested an accommodation. Unlike a plaintiff alleging they had a record of impairment or that they were regarded as having an impairment, "[t]he first, objective definition [of disability under the ADA] examines the extent to which a plaintiff actually suffers from a disability." *Schwartz v. Comex*, No. 96 Civ. 3386, 1997 U.S. Dist. LEXIS 4658, at *4 (S.D.N.Y. Apr. 2, 1997)(citing *School Bd. Nassau Cnty. v. Arline*, 480 U.S. 273, 284 (1987)). At the summary judgement stage, the operative question is if there is evidence in the record that, when construed in the light most favorable to the non-moving party, makes the existence of such an impairment a genuine issue of material fact such that a reasonable jury could return a verdict for the nonmoving party. *See* Fed. R. Civ. P. 56(c); *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 203-04 (3d Cir. 2022).

15

Ms. Sullivan argues that because she experienced an impairment to the major life activity of breathing after receiving the flu shot in 2021, she believed that the 2021 COVID-19 vaccine would cause a similar impairment. According to the Plaintiff, the flu shot in 2021 caused "shortness of breath, rash, hives, itchiness in the back of the neck and throat, throat tightening, feeling out of sorts, malaise, and the swelling of the tongue and lips." (ECF No. 80 ¶ 161). Based on his medical judgment, Dr. Schmidt concluded that the flu shot may have caused Ms. Sullivan to go into anaphylaxis, a serious medical condition which would substantially limit her ability to breathe.

An anaphylactic reaction as described by Dr. Schmidt could be found by a jury to substantially limit one or more of Ms. Sullivan's major life activities. Even though Ms. Sullivan does not claim she is generally at risk of anaphylaxis, "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D). That is why specific allergies — such as an allergy to a vaccine — may qualify as a disability depending on "the severity of the possible reaction." *Doe v. Pittsburgh Reg'l Transit*, 684 F. Supp. 3d 417, 428 (W.D. Pa. 2023).

Defendants argue that the reaction Ms. Sullivan alleges occurred after she received the influenza vaccine is insufficiently severe to qualify as a disability and thus any similar reaction that would have allegedly followed the receipt of the COVID-19 vaccine would similarly not qualify as a disability. According to them, regardless of the "anaphylaxis" label placed on Ms. Sullivan's symptoms by Dr. Schmidt, there was no actual limitation of Ms. Sullivan's major life activities. It is true that "courts have been careful to distinguish impairments which merely affect major life activities from those that substantially limit those activities," and that certain allergic reactions to vaccines have been considered too mild to be considered a disability in some cases.

16

*See Norman v. NYU Langone Health Sys.*, 492 F. Supp. 3d 154, 164 (S.D.N.Y. 2020). But in those cases, there was no testimony that the plaintiff's allergic reaction was "life-threatening." (ECF No. 82-37). Here, such testimony exists, and it comes from a licensed medical doctor. Thus, there is at least a genuine dispute of material fact that the reaction Ms. Sullivan alleges she experienced after taking the influenza vaccine, and that she alleges could have occurred had she taken the COVID-19 vaccine, was severe enough to qualify as a disability. [5]

The question of whether Ms. Sullivan taking the COVID-19 vaccine would have actually caused an allergic reaction is one to be left to the jury. Plaintiff argues that such an allergy exists based on the medical opinion of Dr. Schmidt, who diagnosed Ms. Sullivan with "a very uncommon medical problem" that could be "life-threatening" and required additional medical evaluation. (ECF No. 82-37 at 3). Defendants argue that the exact medical testing Dr. Schmidt recommended was ultimately conducted by Dr. Petrov at this Court's direction, and Dr. Petrov concluded that based on the results of the testing, Ms. Sullivan could safely "proceed with COVID vaccination." (ECF No. 82-40).

"Where there is 'specific, plausible and detailed testimony by dueling expert witnesses,' summary judgment is often inappropriate." *Sightsound.com, Inc. v. N2K, Inc.*, 391 F. Supp. 2d 321, 330 (W.D. Pa. 2003)(quoting *Total Containment, Inc. v. Environ Prods.*, No. 99-1059, 1999 U.S. App. LEXIS 22072, at *11 (Fed. Cir. Sept. 15, 1999)). Here the record reflects the conclusions of two medical professionals, and critically for these purposes, conclusions at variance with one another and which arrived at different times in this case's timeline. On one hand, Dr. Schmidt

---

[5] In his letter Dr. Schmidt checked a box labeled "No" in response to the question: "Does the impairment limit a major life activity or major bodily function." (ECF No. 82-37 at 4). While this seems to contradict his diagnosis of Ms. Sullivan's condition as life-threatening, he clarified in his deposition testimony that he checked the "No" box because at the time he filled out the form Ms. Sullivan was not at that specific moment in anaphylaxis, and that if she had been, he would have checked the box labeled "Yes." (ECF No. 82-15 at 25:20-26:6). That surely appears to create a disputed issue of material fact as to the impact of any possible reaction on Ms. Sullivan's major life activities.

asserts that based on the facts at hand when he evaluated Ms. Sullivan shortly after she took the flu vaccine, she has an uncommon medical condition such that taking the COVID-19 vaccine could have been life-threatening and which required additional evaluation prior to the receipt of any such vaccine. This diagnosis came at the moment in time when Exact was requiring her to receive the COVID-19 vaccine or place her continued employment at risk. On the other hand, Dr. Petrov concluded years after her employment ended that Ms. Sullivan would not have faced any complications by taking the COVID-19 vaccine when it was required of her. It will be up to a jury to determine whether Ms. Sullivan was actually disabled by an allergy to a vaccine or vaccine component at the time her employment ended, making summary judgment inappropriate.

Beyond that, upon closer examination, those two medical opinions are not necessarily in conflict. Dr. Schmidt was exercising his medical judgment based on the limited facts before him when he rendered it; he compared his assessment of the impact of the flu vaccine on Ms. Sullivan to his understanding of the overlap of vaccine contents as between the flu vaccine at the time and the COVID-19 vaccine. Dr. Schmidt did not have the ability to perform a proper skin test on Ms. Sullivan to definitively diagnose her with an allergy to the COVID-19 vaccine, and thus his opinion was limited by the lack of such testing results. By the time Dr. Petrov conducted a skin test and received its results these additional facts allowed him to opine that Ms. Sullivan could in fact safely receive the COVID-19 vaccine.

But what a rational jury could also conclude from that context of the medical documentation is that at the time Dr. Schmidt opined that Ms. Sullivan should not receive the COVID-19 vaccine without clearance generated by skin testing at least two things were true: (1) Exact was requiring her to receive that vaccine as a condition of her continued employment, which could be found to be an essential function of the job; and (2) that she had a documented medical

18

condition that substantially impaired her ability to perform her job within the parameters set by her employer and as a direct result of that medical condition. While that dynamic ultimately did change when Ms. Sullivan actually had the skin testing (and which would have been cleared up two weeks after Exact's final deadline had she been tested at that time), when her employment terminated, a jury could conclude that she was "disabled" by virtue of Dr. Schmidt's opinion. Those are disputed issues of fact, and they are material.

Ms. Sullivan also argues that she meets the definition of disability under the "record of" prong. "An individual has a record of a disability if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k)(1). Protections for those with a record of being disabled cover those who do not actually have a disability but who still "may remain vulnerable to the fears and stereotypes of their employers." *Davidson v. Midelfort Clinic*, 133 F.3d 499, 509 (7th Cir. 1998). For example, a cancer patient who is in remission cannot be discriminated against because an employer is worried the cancer may cause lingering weakness. An employee with a record of having a disability is entitled to reasonable accommodations, even if the disability is no longer active, but they must be "related to the past disability." 29 C.F.R. § 1630.2(k)(3). Such accommodations can include "leave or a schedule change to permit him or her to attend follow-up or 'monitoring' appointments with a health care provider." *Id.*

The inquiry here is fact intensive. Ms. Sullivan must establish there is some documented record of her having an impairment that substantially limited a major life activity. *See Eshelman v. Agere Sys.*, 554 F.3d 426, 437 (3d Cir. 2009). To establish such a record, a plaintiff need only point to some documentation that references their having a disability covered by the ADA. The documentation can come from any source, including "education, medical, or employment

records." 29 C.F.R. Pt. 1630 App. Crucially, the documentation must "identify[] a limitation" of Plaintiff's major life activities caused by the recorded disability. *See Gardner v. SEPTA*, 410 F. Supp. 3d 723, 738 (E.D. Pa. 2019). The focus must be on if the Plaintiff "has submitted evidence that the actual extent of his or her impairment was substantial." *Eshelman*, 554 F.3d at 437.[6]

The letter Dr. Schmidt sent to Exact in support of Ms. Sullivan's accommodation request is sufficient for a jury to conclude that there was a documented record of her having an impairment substantially limiting a major life activity. Dr. Schmidt writes in that letter: "Due to an anaphylactic response to a past flu vaccine, it is my professional opinion that [Ms. Sullivan] has a significant possibility of experiencing a similar life-threatening reaction to the" COVID-19 vaccine. (ECF No. 82-37 at 1). A document that states an employee could suffer a life-threatening reaction to the COVID-19 vaccine in circumstances in which the employer was requiring taking that vaccine to continue working is one that a jury could conclude establishes a record of a disability.

When reading the evidence in the record most favorably to Ms. Sullivan, she has sufficiently demonstrated there is genuine question of material fact both regarding her actually being disabled at the time her accommodation request was denied, and regarding the existence of a record of her having a disability. And certainly, the jury could conclude that her employer was aware of all of this given that Exact employees spoke to Ms. Sullivan about her accommodation

---

[6] The Third Circuit has also said that generally for disability discrimination cases a plaintiff must provide evidence their employer "relied upon [the] record of impairment in making its employment decision." *Eshelman*, 554 F.3d at 437. While the Third Circuit has not opined as to whether this requirement equally applies to failure-to-accommodate claims, this Court believes that it does not. Those with a record of a disability are equally entitled to a reasonable accommodation. *See* 29 C.F.R. § 1630.2(k)(3); *but see Taylor*, 184 F.3d at 306 n.2 (questioning the availability of failure-to-accommodate claims for those pursuing a "record of" theory of disability). And in a failure-to-accommodate claim, the adverse employment decision complained of involves the lack of a reasonable accommodation. *See Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004). But it is hard to imagine how to prove an employer relied on a record of a disability when deciding *not* to provide a reasonable accommodation. There are many reasons for an employer not providing a reasonable accommodation, but it seems implausible that any of them would be based in the discovery of some record of an employee's disability. Thus, the Court concludes that at least in the circumstances presented here, the causation requirement for "record of" theories of disability is not applicable to failure-to-accommodate claims.

request, a request that included Dr. Schmidt's diagnosis of her condition. (ECF No. 80 ¶¶ 231, 232). Thus, summary judgment cannot be granted on the grounds that Ms. Sullivan is not disabled under either of the two relevant statutory definitions.

       *c.  Ms. Sullivan's Request For An Accommodation.*

To meet the second element of a failure-to-accommodate claim, Ms. Sullivan must demonstrate that she "requested accommodations or assistance." *Williams*, 380 F.3d at 772. This element is easily met on the current record. Ms. Sullivan provides ample evidence that on August 18, 2021, she formally requested her employer provide an accommodation by withholding any decision about her continued employment until she had been tested by Dr. Petrov and received those results. (ECF No. 80 ¶ 76).

       *d.  Exact's Good Faith Effort To Assist.*

"The ADA imposes upon employers a good-faith duty 'to engage [with their employees] in an interactive process to identify a reasonable accommodation.'" *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 581 (4th Cir. 2015)(quoting *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 346 (4th Cir. 2013)). The ADA does not "require an employer to provide an employee with the accommodation of her choosing." *Diaz v. City of Phila.*, 565 F. App'x 102, 106 (3d Cir. 2014), but instead introduces the interactive process to determine "the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations," *Taylor*, 184 F.3d at 316 (quoting 29 C.F.R. § 1630.2(o)(3)). An employer can show good faith in the interactive process by "meeting with the employee; requesting information about the employee's condition and limitations; asking the employee what accommodation she wants; showing some sign of having considered her request; and offering and discussing available alternatives." *Ruggiero v. Mount Nittany Med. Ctr.*, 736 F. App'x 35, 39 (3d Cir. 2018).

21

Ms. Sullivan argues that Defendants never acted in good faith throughout the interactive process that began when she requested an accommodation to Exact's COVID-19 vaccine policy. While she admits that Exact collected documents seeking information about her condition, she argues that there was never any attempt to consider her request or to offer any viable alternatives. According to Ms. Sullivan, the hotly charged phone call between Mr. Roth and Defendant Conroy, and the comments Mr. Conroy alleged made about friends of Mr. Roth (which could be found to include Ms. Sullivan) was evidence that Defendants did not seriously consider her accommodation request. And she continues that Exact did not offer alternative accommodations to her, at least not viable ones. She argues that offering severance pay is not a legitimate alternative accommodation, and neither is the opportunity to apply to other jobs at Exact for which she was unqualified, or which were otherwise inferior to her PMR position.

Ms. Sullivan has raised a genuine issue of material fact as to whether Defendants engaged in the interactive process in good faith. At the very least there is a question as to if Exact actually offered alternative accommodations. Severance is generally not considered a reasonable accommodation, because by definition it undermines an employee's ability to enjoy "equal benefits and privileges of employment" by terminating that employment. *See* 29 C.F.R. § 1630.2(o)(iii)(defining reasonable accommodation). And while a transfer to another position can be a reasonable accommodation, *see Shelton v. Univ. of Med. & Dentistry*, 223 F.3d 220, 226-28 (3d Cir. 2000), that is not what Exact offered Ms. Sullivan. What Exact offered was the chance to *apply* for a transfer. There was no guarantee she would get the job. And if Ms. Sullivan is proven correct that her application to any of the available positions would be denied because she was unqualified, or that any of those positions were inferior to her current position, then then the proffered accommodation would in those circumstances be rendered weightless.

22

*e.    The Reasonableness of Ms. Sullivan's Requested Accommodation.*

Ms. Sullivan argues that allowing her a temporary exception to the company's vaccine mandate so that she could be tested as Dr. Schmidt advised was a reasonable accommodation request. Exact counters that it was an unreasonable request because it would create an undue hardship by placing additional risk on the company through the increased chance of spreading COVID-19 to healthcare personnel and patients while awaiting that test to occur and the results analyzed. There is a genuine issue of material fact on this point.

Employers are exempt from making a reasonable accommodation if "the accommodation would impose an undue hardship on the [employer's] operation of the business." 42 U.S.C. § 12112(b)(5)(A). An accommodation presents an undue hardship when providing it entails "significant difficulty or expense." 29 C.F.R. § 1630.2(p)(1). In a failure-to-accommodate claim, the plaintiff "must show, as part of her burden of persuasion, that an effective accommodation exists that would render her otherwise qualified." *Walton*, 168 F.3d at 670. Once the plaintiff shows an accommodation exists and that it is facially reasonable, meaning "the costs of which, facially, do not clearly exceed its benefits," the burden shifts to the defendant to prove that it creates an undue hardship or is otherwise unreasonable. *Id.*

Exact extending its vaccine deadline by an additional two weeks — the accommodation Ms. Sullivan advanced and which a jury could find as being facially reasonable — could be found to have not imposed an undue hardship on Exact or its business. A jury could find that allowing Ms. Sullivan to continue to work as a PMR in that time interval would not have strained the "overall financial resources" of Exact. 29 C.F.R. § 1630.2(p)(2)(i)-(iii). And it could find that the "impact of the accommodation" would not have frustrated Exact's operations or the ability of other employees to perform their duties, especially seeing as Ms. Sullivan had committed to abiding by

the masking, distancing, and testing policies that had been successful in preventing the spread of COVID-19 prior to the vaccine becoming available. 29 C.F.R. § 1630.2(p)(2)(vi)-(v).

And it is on this point that the parties have by their decisions and actions as set out in the record generated both genuine issues of material fact, and facts on which the jury could readily find against either of them.

On the one hand is the bucket of facts that would demonstrate to a jury that given the nature of their work involving face-to-face interactions with healthcare providers, and what became the ready availability of the COVID-19 vaccine coupled with it repeat extensions of the time for the receipt of vaccination, Exact was acting completely reasonably in both requiring PMRs to receive the COVID-19 vaccine and in its response to Ms. Sullivan's individual request for yet another delay in applying the policy as to her, particularly given the long time interval between when Dr. Schmidt advised that she be skin tested and when Dr. Petrov could see her. And then there is the fact that the record could also support the conclusion that Ms. Sullivan was seemingly in no hurry whatsoever to be skin tested, given that there is no evidence advanced that she did anything to be tested sooner by any other allergy specialist comparable to Dr. Petrov, all coming with the overlay of record evidence of her general opposition to being vaccinated, leading to a conclusion that her accommodation request in the nature of more time to be tested was not reasonable. And the jury could find that for all the back and forth that did and did not occur, one essential piece to the puzzle that was and remains missing was an unequivocal commitment by Ms. Sullivan to return to duty fully vaccinated if she cleared the skin test.[7]

---

[7] Given that Ms. Sullivan bears the burden of persuasion in demonstrating that her proffered accommodation would have rendered her qualified for the PMR position, *see Walton*, 168 F.3d at 670, the question of if extending the vaccination deadline could lead to her receiving the vaccine is a material issue of fact. If Ms. Sullivan were allowed a deadline extension to pursue skin testing and still would not have received the COVID-19 vaccine after being medically cleared to do so, then the requested deadline extension would not have rendered her qualified, assuming taking the vaccine was essential to the qualifications of her PMR position. There appears to be a genuine dispute as to this material issue of fact. Ms. Sullivan was unequivocal that she "didn't want to get" the vaccine. (ECF No. 75-2 at

But at the same time, there is little evidence in the record that Exact's goals for its testing requirement for PMRs could not be achieved (or at least would not be materially frustrated) while having given Ms. Sullivan an additional two weeks to obtain a skin test confirming if the COVID-19 vaccine would cause a life-threatening reaction as was the concern of Dr. Schmidt — especially because Exact was already offering extensions of time to other employees. (ECF No. 87-3 at 5-6). And while the specific circumstances surrounding those employees may differ from those surrounding Ms. Sullivan, the fact Exact gave extensions to those employees could be found to undermine any broader argument that providing such an extension here would have created such an undue hardship for the company.

Ms. Sullivan's failure-to-accommodate claim will proceed to the jury. She has raised genuine questions of material fact on all four elements of the claim. Thus, Defendant's Motion for Summary Judgment is DENIED as to Count I.

### III.    Defendants Will Be Granted Summary Judgment on Plaintiff's Retaliation Claims.

Defendants are entitled to summary judgement as to Count II, which alleges unlawful retaliation in violation of the ADA and PHRA. The record evidence could be found to demonstrate that Ms. Sullivan's employment termination was caused by her failure to abide by Exact's company policy regarding COVID-19 vaccinations, but on the record before the Court, the termination of her employment could not be found to have been caused by retaliation against her for her having made an accommodation request. Because no reasonable jury could find the adverse

---

178:14-19). In a lengthy email sent to Defendant Conroy, Ms. Sullivan stated that "there is not a human being on the planet who can provide clear evidence that I will benefit, or more importantly, avoid long-term unwanted side effects from this novel approach to 'vaccines', I cannot allow myself to agree to receiving it." (ECF No. 75-2 at 227). However Ms. Sullivan also had scheduled an appointment to receive the COVID-19 vaccine prior to meeting with Dr. Schmidt. (ECF No. 82-35 at 2). She also had admitted that she "was willing" to get the vaccine if it was necessary to keep her job. (ECF No. 82-15 at 59:9-17). These conflicting pieces of evidence make the question of if Ms. Sullivan would receive the vaccine even if granted her requested accommodation and was subsequently cleared to do so "a genuine issue for trial." *Liberty Lobby, Inc.*, 477 U.S. at 248.

employment action Ms. Sullivan suffered was caused by her engagement in protected activity, her claim of unlawful retaliation fails.

"[U]nlike a general ADA discrimination claim, an ADA retaliation claim does not require that the plaintiff demonstrate a disability within the meaning of the ADA." *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 188 (3d Cir. 2010). Instead, a retaliation claim follows the familiar burden shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). While the burden of production shifts in this framework, the plaintiff always carries the ultimate burden of persuasion. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

The framework starts with a prima facie case. A prima facie retaliation claim requires Plaintiff to show: (1) she engaged in protected activity; (2) there was an adverse action taken by the employer either after or contemporaneous with the employee's protected activity; and (3) there was a causal connection between the employee's protected activity and the employer's adverse action. *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015). If Ms. Sullivan makes this showing, the burden shifts to her employer to produce a legitimate, non-retaliatory reason for having taken the adverse action. *Id.* If the employer produces such a reason, the burden shifts one final time back to the Plaintiff to demonstrate that "the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007).

Defendants argue Ms. Sullivan's retaliation claim fails out of the gate because she has not established a prima facie case. All parties agree that her requesting an accommodation as outlined above was a type of employee activity protected by statute and that Plaintiff's termination was an

26

adverse action taken by her employer. The sole battle on this issue is over the existence of a causal connection between Ms. Sullivan's accommodation request and her termination.

"We consider 'a broad array of evidence' in determining whether a sufficient causal link exists to survive a motion for summary judgment." *LeBoon v. Lancaster Jewsish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007). Relevant evidence includes: the temporal proximity between the protected activity and adverse action, any intervening antagonism, inconsistencies in the employer's articulated reasons for taking the adverse action, or any other evidence in the record sufficient to support the inference of retaliatory animus. *Id.* at 232-33. "The plaintiff, however, cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted." *Daniels*, 776 F.3d at 196.

Temporal proximity is king when attempting to establish a causal connection between a protected activity and adverse action. An "unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action" alone can establish causation. *Lauren W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). And the next best thing is "a pattern of antagonism coupled with timing." *Id.* A multi-week gap between protected activity and adverse action is not unusually suggestive without additional evidence. *Compare Tirk v. Dubrook, Inc.*, 673 F. App'x 238, 241 (3d Cir. 2016) (one month gap is not unusually suggestive), *with Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012) (seven-day gap is unusually suggestive); *but see Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 285-86 (3d Cir. 2000) (three to four week gap is not unusually suggestive, but establishes causation when combined with employer's inconsistent explanations and sudden change in behavior).

27

Of course, a large gap in timing between actions does not foreclose the possibility one caused the other. The law recognizes this, which is why causation in the prima facie case can alternatively be established by "evidence gleaned from the record as a whole." *Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016). A particularly reliable indicator of causation is the treatment of similarly situated coworkers who did or did not engage in the protected activity. *See Garcia v. Vertical Screen*, 592 F. Supp. 3d 409, 421 (E.D. Pa. 2022).

The timing between Ms. Sullivan's accommodation request and her termination is not unusually suggestive of unlawful retaliation. Ms. Sullivan officially submitted her accommodation request on August 18, 2021, after Dr. Schmidt faxed a completed accommodation request form to Exact stating that Ms. Sullivan should not receive the COVID-19 vaccine until she is evaluated by an expert. Exact terminated Ms. Sullivan's employment six weeks later: on October 4, 2021. Without additional evidence, a gap of "six weeks, does not raise an inference of causation." *Jacobs v. Cnty. of Bucks*, No. 22-2327, 2023 U.S. App. LEXIS 17257, at *7 (3d Cir. July 10, 2023).

But Ms. Sullivan claims the record contains the requisite additional evidence of causation. She argues there are four points that, when considered together, would allow a jury to conclude that she has established causation. First is Defendant Kevin Conroy's alleged animus towards individuals who did not wish to receive the COVID-19 vaccine, as exemplified in his hotly charged phone conversation with Mr. Roth. Second is the fact that other employees were granted what Plaintiff says were similar accommodation requests while hers was denied. Third is the conflicting testimony regarding Defendant Conroy's personal involvement in the decision to deny Ms. Sullivan's accommodation request. And finally is the lack of any testimony explaining why extending the vaccine deadline as Ms. Sullivan requested would be detrimental to Exact's interests.

28

But even when viewing this additional evidence in the light most favorable to Ms. Sullivan, it fails to plausibly demonstrate causation for purposes of a retaliation claim.

Defendant Conroy's alleged animosity toward individuals who chose not to get the COVID-19 vaccine does not imply he, or his company, took retaliatory action against employees because they requested an accommodation. The evidence might show that Defendant Conroy disagreed with the position taken by many Americans that the COVID-19 vaccine was possibly unsafe and altogether unnecessary to prevent the spread of the novel coronavirus. And a reasonable jury could find that Defendant Conroy's strong feelings on the subject were manifested in some sort of a personal dislike of those who, without "legitimate health reasons," choose not to get the vaccine, and that Mr. Conroy considered Mr. Roth one of those people. (ECF No. 82-3 at 131:19-25) But even if Mr. Conroy personally disliked Mr. Roth or Ms. Sullivan for that or any other reason, "personal dislike is not a forbidden retaliatory animus." *Smart v. Cnty. of Gloucester*, 681 F. Supp. 3d 306, 336 (D.N.J. 2023); *see Okokuro v. Pa. Dep't of Welfare*, No. 00-2044, 2001 U.S. Dist. LEXIS 6270, at *18-19 (E.D. Pa. May 15, 2001).

And the fact that Exact granted other accommodation requests but not Ms. Sullivan's if anything would demonstrate that something other than the protected activity motivated her termination. Causation requires Ms. Sullivan demonstrate that her requesting an accommodation "was the *likely reason* for" her termination. *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 261 (3d Cir. 2017). And as noted, it is undisputed that the Defendants did not terminate a number of other employees who engaged in the same protected activity Ms. Sullivan engaged in, namely requesting a delay in being vaccinated, undercutting any claim that the protected activity of requesting an deadline extension accommodation was a problem for Exact.

29

Why were some employees granted the relief Ms. Sullivan was denied? The answer in the record: these PMRs would and did receive the vaccine in compliance with Exact's company policy as soon as it was medically permissible. Ms. Sullivan on the other hand, was at best staunchly on the fence about ever taking the vaccine no matter what Dr. Petrov advised, and the record does not advance evidence that she indicated to Exact that she would definitely take the vaccine if the results of the December skin tests revealed no medical impediment to her doing so. No other deadline extensions were given without requiring eventual vaccination, and in fact two other employees, who, like Ms. Sullivan, would not commit to vaccination were similarly terminated from employment. (ECF No. 80 ¶¶ 408, 493). Thus, evidence could not be found by a jury to suggest unlawful retaliation, as if anything, they demonstrate that Exact's treatment of Ms. Sullivan "was consistent with its treatment of other employees" who also would not commit to abiding by the company's vaccination policy. *See Garcia*, 492 F. Supp. 3d at 421.

Finally, it is true that the testimony of another Exact employee could be found to undercut Defendant Conroy's testimony that he was not personally involved in denying Ms. Sullivan's accommodation request, but a fact disputed by two separate individuals does not raise the same suspicion as "inconsistent explanations" provided by the same person. *See Waddell v. Small Tube Prods., Inc.*, 799 F.2d 69, 73 (3d Cir. 1986). And while a jury might conclude that there was no inherently compelling reason a later date was not chosen as a final deadline for Ms. Sullivan's vaccination, that is not the point in assessing whether a rational jury could find unlawful retaliation for her having sought the accommodation in the first place, being that the law recognizes that all company policies must have some deadline to be effective and that all "[d]eadlines are inherently arbitrary." *United States v. Boyle*, 469 U.S. 241, 249 (1985). It is not the role of the Court or a jury to second guess the wisdom of an employer's otherwise lawful workplace decisions. *See Keller v.*

*Orix Credit Alliance*, 130 F.3d 1101, 1108-09 (3d Cir. 1997) ("The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]."). And as noted above, the record is not in dispute that Exact had already generally extended its deadline once, had given Ms. Sullivan the option of a second deadline extension if she would commit to being vaccinated, and that Ms. Sullivan had not demonstrated that even with the proposed second deadline extension (or any other beyond that), she would have certainly complied with Exact's vaccination policy if she was medically cleared to do so.

A rational jury could not conclude that Ms. Sullivan's accommodation request was the cause of her employment termination. Given the legal principles outlined above, and the undisputed facts of record, while the Court does conclude that a reasonable jury could find that Ms. Sullivan was legally entitled to a reasonable accommodation and that she was denied an accommodation in violation of federal and state anti-discrimination laws, the record does not support a conclusion that her making the accommodation request itself caused her employment loss, and summary judgment will be granted as to her retaliation claims.

The record is undisputed that Exact extended its deadlines in the past, and provided the two referenced employees a requested accommodation of an extension of time to receive the vaccinations in light of their demonstrated medical conditions coupled with their willingness to receive the vaccine once able (shown by the fact that they did receive the vaccine). These employees engaged in the same protected activity Ms. Sullivan engaged in but were not terminated from employment. And the other pieces of causation evidence Ms. Sullivan advances — the CEO's alleged dislike of those skeptical of the COVID-19 vaccine and the failure to explain why Plaintiff's requested deadline extension was unacceptable — do not provide sufficient grounds for

31

a reasonable jury to conclude that Ms. Sullivan's termination was due to her accommodation request rather than her failure to abide by the company's policy.

Terminating an employee's employment because they failed to comply with a company's otherwise lawful policy is not an example of unlawful retaliation. *See Capps v. Mondelez Global, LLC*, 847 F.3d 144, 152 (3d Cir. 2017). Because Ms. Sullivan does not present evidence from which a reasonable jury could conclude that her termination was caused by retaliation for her engaging in a protected activity, her retaliation claim fails and Defendants' Motion for Summary Judgment will be GRANTED as to Count II.

### IV.    Defendants Are Entitled To Summary Judgment on Plaintiff's FMLA Interference And Retaliation Claims Because She Is Not Entitled To FMLA Benefits.

Defendants are also entitled to Summary Judgment on Counts III and IV, alleging unlawful interference and unlawful retaliation in violation of the FMLA. Claims under the FMLA depend on the existence of some serious health condition, that, under that statute's definition, requires some form of continuous treatment. Even assuming that Ms. Sullivan had some form of episodic vaccine allergy, the treatment she received for this condition was too infrequent to meet the FMLA's requirements for a "serious health condition." Without such a serious health condition, Ms. Sullivan cannot successfully assert any claim under the FMLA.

Ms. Sullivan alleges that Defendants violated the FMLA by interfering with her right to receive leave as an employee with a serious health condition and by retaliating against her for requesting such leave. "To succeed on an FMLA interference claim, an employee must prove that he was entitled to benefits under the FMLA." *Rodriquez v. SEPTA*, 119 F.4th 296, 298 (3d Cir. 2024). The same is true for a claim of retaliation brought under the statute. *See Snider v. Wolfington Body Co.*, No. 16-02843, 2016 U.S. Dist. LEXIS 143116, at *22 (E.D. Pa. Oct. 17, 2016)(collecting cases). Under the FMLA "an eligible employee shall be entitled to a total of 12

32

workweeks of leave during any 12-month period for . . . a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" is one involving "(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(2)(11).

Ms. Sullivan argues that she was entitled to employee benefits under the FMLA because her alleged vaccine component allergy is a "chronic serious health condition" requiring continuous treatment. Under the FMLA and the regulations promulgated under that statute, a "chronic serious health condition is one which: (i) requires periodic visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider; (ii) continues over an extended period of time (including recurring episodes of a single underlying condition); and (iii) may cause episodic rather than a continuing period of incapacity." 29 C.F.R. § 825.102.

To be considered a chronic serious health condition Ms. Sullivan's allergy must require at least bi-annual visits to a health care provider for treatment. Ms. Sullivan must have sought treatment, which "includes (but is not limited to) examinations to determine if a serious health condition exists and evaluations of the condition" and may involve "a course of prescription medication or therapy requiring special equipment to resolve or alleviate the health condition." 29 C.F.R. § 825.113(c). For such treatment from a health care provider to be "required" it cannot be easily substituted by home remedies, as "treatment that includes the taking of over-the counter medications . . . and other similar activities that can be initiated without a visit to a health care provider, is not, by itself, sufficient to constitute a regimen of continuing treatment." *Id.*

33

Ms. Sullivan's condition must have also continued over an extended period of time. The FMLA does not define what constitutes an extended period of time. The Third Circuit has found three years to be sufficient, *Victorelli v. Shadyside Hosp.*, 128 F.3d 184, 189 (3d Cir. 1997), and other courts have held the condition "must exist for well more than a few weeks," *See Hansler v. Lehigh Valley Hosp. Network*, 798 F.3d 149, 154 n.5 (3d Cir. 2015)(quoting *Taylor v. Autozoners, LLC*, 706 F. Supp. 2d 843, 852 (W.D. Tenn. 2010)). Medical dictionaries consider a chronic condition to be one "persisting 3 months or longer." *Bieber v. Nace*, No. 10-cv-0718, 2012 U.S. Dist. LEXIS 29386, at *9 (M.D. Pa. Mar. 6, 2012) (quoting Stedman's Medical Dictionary 376 (28th ed. 2006)).

Finally, Ms. Sullivan's allergy must have caused her to experience an episodic period of incapacity. "The term incapacity means inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." 29 C.F.R. § 825.113. Regular daily activities generally involve "performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working." *Wegelin v. Reading Hosp. & Med. Ctr.*, 909 F. Supp. 2d 421, 427 (E.D. Pa. 2012). A person experiences episodic incapacity when their condition occasionally interrupts their ability to perform one or more of these tasks.

Ms. Sullivan cannot bring any claim under the FMLA because she is not an eligible employee under that statute. She argues that she had a longstanding allergy to vaccines, beginning in at least 2005. She contends that she had to seek medical treatment at least twice in 2021 because of the flu vaccine she received that year. But as is undisputed by both parties, (ECF No. 80 ¶ 70), these visits in 2021 are the only time Ms. Sullivan sought medical treatment for her alleged allergy.

34

(ECF No. 75-2 at 130:13-131:4). This fails to meet the FMLA's requirement that her condition be severe enough to warrant medical treatment at least twice a year — in *every* year — she had the condition. *See* 29 C.F.R. § 825.102; *Watkins v. Blind & Vision Rehab. Servs.*, No. 16cv01850, 2018 U.S. Dist. LEXIS 160076, at *13-14 (W.D. Pa. Sept. 19, 2018). Summary judgment will be entered in favor of all Defendants as to Ms. Sullivan's FMLA claims.

**V.      There Is Genuine Issue of Material Fact As To Defendant Kevin Conroy's Involvement In Denying Plaintiff's Accommodation Request Thereby Allowing Her Aiding And Abetting Claim To Go To Trial.**

"Unlike the ADA, the PHRA provides for individual liability in cases where a person aids and abets acts of discrimination." *Bernhard v. Brown & Brown of Lehigh Valley, Inc.*, 720 F. Supp. 3d 694, 705 (E.D. Pa. 2010). This applies to all actions the PHRA deems unlawful, including claims for disability discrimination. *See* 43 Pa. Stat. § 955(e). The Third Circuit distinguishes between coworkers, who cannot be held liable under an aiding and abetting theory, and supervisors, who can. *Dici v. Pennsylvania*, 91 F.3d 542, 552-53 (3d Cir. 1996).

Courts in this Circuit define a "supervisor" for Section 955(e) purposes by reference to the Supreme Court's opinion in *Vance v. Ball State Univ.*, 570 U.S. 421 (2013). *See LaCoe v. Pa. State Univ.*, No. 14-cv-1818, 2016 U.S. Dist. LEXIS 38346, at *33 n.85 (M.D. Pa. Mar. 24, 2016)(collecting cases). There, the Supreme Court defined a supervisor as one who "is empowered by the employer to take tangible employment actions against the victim." *Id.* at 424. A tangible employment action is any that "effect[s] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 429.

Section 955(e) does not automatically apply to a defendant because they are a supervisor. To be liable for aiding and abetting an act of discrimination, an individual defendant must have "actively or affirmatively participated in or compelled the discriminatory conduct." *Wilson v.*

35

*Child.'s Museum of Pittsburgh*, No. 05cv1748, 2006 U.S. Dist. LEXIS 28978, at \*7 (W.D. Pa. May 12, 2006)(citing *Dici*, 91 F.3d at 542). This standard requires more than mere knowledge and acquiescence of the conduct.

In this case, there is little doubt that Defendant Conroy, as the CEO of Exact, is a supervisor. "[E]ven those completely unfamiliar with business hierarchy should be aware that the CEO is top of the corporate food chain." *Hornby v. Endless Mt. Behav. Health Ctr., Inc.*, No. 25-CV-00465, 2025 U.S. Dist. LEXIS 186322, at \*10 (M.D. Pa. Sept. 23, 2025). While the powers of a CEO are rarely unlimited, their status as the leader of a business organization almost always provides them the ability to affect a significant change in employment status, at least informally.

And Ms. Sullivan has raised a factual question as to whether Defendant Conroy actively participated in denying her accommodation request. There is conflicting testimony regarding Defendant Conroy's involvement in deciding particular accommodation requests. If indeed, Mr. Conroy was the "primary decisionmaker," (ECF No. 80-4 at 41:4-13), who was in charge of denying Ms. Sullivan's request and in granting and denying those from others, then there is evidence from which a jury could conclude that he aided and abetted any meritorious disability discrimination claim based on the unlawfulness of that denial. But if Defendant Conroy was really only responsible for general policy determinations, then the jury could conclude that he did not actively or affirmatively participate in the denial of Ms. Sullivan's specific accommodation request, absolving him of personal liability. The conflicting testimony now in the record raises a genuine issue of material fact as to Plaintiff's aiding and abetting claim as to the failure to accommodate theory and as to Mr. Conroy, and thus summary judgment will be DENIED as to Count V.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 72) will be GRANTED IN PART and DENIED IN PART. Summary judgment in favor of the Defendants will be GRANTED as to Counts II, III, and IV. Summary judgment will be DENIED as to Counts I and V.

An appropriate Order will issue.

/s/ Mark R. Hornak
Mark R. Hornak
United States District Judge

Dated: July 29, 2026